UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

IN RE:
Rockville Orthopedic Associates, P.C.,
d/b/a
Connecticut Orthopaedic & Sports
Medicine Center

Chapter 11

Debtor

Case No. 06-20916

Rockville Orthopedic Associates, P.C. )
d/b/a )
Connecticut Orthopaedic & Sports )
Medicine Center )
)
Plaintiff )
)
v. )
)
James S. Kort, M.D. and )
Robert Cook, M.D. )
)
Defendants )

Adversary Proceeding

No. 06-2074

**APPEARANCES:**

Irve J Goldman, Esq. and Jessica Grossarth, Esq.
Pullman & Comley, LLC
850 Main Street, PO Box 7006, Bridgeport, CT 06601
Counsel for Plaintiff-Debtor

David A. Reif, Esq. and William K. Piotrowski, Esq.
McCarter & English, LLP
185 Asylum Street, CityPlace I, Hartford, CT 06103
Counsel for Defendant Kort

## RULING ON DEFENDANT KORT'S MOTION FOR SUMMARY JUDGMENT

KRECHEVSKY, U.S.B.J.

I.

Rockville Orthopedic Associates, P.C. d/b/a/ Connecticut Orthopaedic & Sports

Medicine Center ("the debtor"), on September 29, 2006, filed a voluntary Chapter 11 petition ("the petition") in this court. The petition described the debtor as a "small business debtor" pursuant to Bankruptcy Code §101(51D) with assets of $1,156,416.74 and liabilities of $655,331.74. Richard D. Fischer, M.D. ("Fischer"), as president of the debtor and as its 100% stockholder, attested to the truth of the information in the petition. The petition lists Fischer's salary (from 9/29/2005 to 9/29/2006) as $332,852.66. The debtor, on November 16, 2006, filed an adversary proceeding against James S. Kort, M.D. ("Kort") and Robert Cook, M.D. ("Cook") with a pleading entitled "Complaint for (A) Characterization of Note Obligation as an Equity Contribution ["First Count"]; (B) Equitable Subordination ["Second Count"]; and (C) Breach of Fiduciary Duty ["Third Count"]." While only the First Count applied to Cook, all counts are directed against Kort. Kort, after filing an answer on January 5, 2007, to the complaint, filed the instant motion for summary judgment ("the motion") in his favor on June 11, 2007, pursuant to Fed. R. Bankr. P. 7056 (incorporating Fed. R. Civ. P. 56 without change) and D.Conn. L.Civ.R. 56 (made applicable in bankruptcy proceedings by D.Conn. LBR 1001-1(b), and dismissal of the complaint as to him.

## II.

## BACKGROUND

The following background, based upon the papers filed by the parties, is uncontested. The debtor is a professional corporation engaged since 1972 in the practice of orthopedic medicine. Kort began his employment with the debtor in 1982 and, in 1985, became an officer and shareholder. In 1992, the debtor entered into written contracts of employment with, inter alia, its three shareholder physicians, Kort,

Cook, and Fischer, who then held equity interests in the debtor of 33%, 34%, and 33%, respectively.

In 1991, the debtor executed and delivered to each shareholder two negotiable promissory notes, each entitled "Demand Promissory Note," for loans made to the debtor by each shareholder. The first note, dated July 1, 1991, was in the amount of $35,000 and the second note, dated December 31, 1991, was in the amount of $15,000 (together "the notes"). Each note was payable on demand and provided for interest at the rate of 10% per annum and payment of attorney's fees and costs incurred to enforce the notes. It is these notes that the complaint, in the First Count, contends "should be determined by the Court to be equity contributions." (Complaint ¶26.)

Kort, on June 27, 2004, sent Cook and Fischer letters tendering his resignation from the debtor "effective September 30, 2004 11:59 p.m," after which he relocated to Arizona. All shareholders had received interest payments on the notes twice a year during the prior 12 years. When, after his resignation and prior to the debtor's petition, Kort demanded payment of his notes, the debtor refused and Kort brought an action against the debtor in the Connecticut Superior Court to enforce payment ("the state-court action"). The debtor, in response to Kort's complaint, filed an "Amended Special Defenses and Counterclaim" on November 8, 2005, in which it alleged: (1) as its "First Special Defense" that, "[Kort] agreed not to demand payment of his promissory notes, which were part of his capital investment in the defendant...."; (2) as its "Second Special Defense" that Kort should be equitably estopped from collecting the amounts due him under the notes because his job search and resignation harmed the debtor; and (3) "By Way of Counterclaim," that Kort breached his fiduciary duty

to the debtor by resigning. (Roberts Aff. ¶5.) On the eve of trial of the state-court action, the debtor filed its petition.

## III.

## SUMMARY JUDGMENT

### A. Summary Judgment Standards

Fed.R.Civ.P. 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." "The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997). In reviewing a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir.2003). A motion for summary judgment may not be defeated by the "mere existence of a scintilla of evidence in support of the plaintiff's position; there must be evidence on which the [finder of fact] could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. at 252. "[T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id. at 250.

4

### B   Kort's Use of Depositions Taken in State-Court Action

Kort, to comply with Rule 56(c) and establish that there is no genuine issue of material fact, seeks to use, in the present proceeding, the same deposition transcripts lawfully taken and duly filed in the state-court action, as permitted by Fed. R. Civ. P. 32(a)(4). That rule provides:

> [W]hen an action has been brought in any court of the United States or of any State and another action involving the same subject matter is afterward brought between the same parties or their representatives or successors in interest, all depositions lawfully taken and duly filed in the former action may be used in the latter as if originally taken therefor.

(Fed. R. Bankr. P. 7032 incorporates the provisions of Fed. R. Civ. P. 32 without change.)

The debtor objects to Kort's use of such depositions because it contends the instant proceeding and the state-court action do not involve "the same subject matter." The debtor asserts that, if the depositions are not available to Kort, there is insufficient support for Kort's Rule 56(c) obligations and the motion should be denied. The court concludes that the debtor's objection is not sustainable in light of the quoted pleadings and that Kort's use of the depositions from the state-court action in the instant action is appropriate.

### IV.

### FIRST COUNT - RECHARACTERIZATION OF DEBT
### AS EQUITY CONTRIBUTION

Paragraphs 14 and 15 of the complaint's "Factual Background" state:

14.   In causing the Debtor to issue the Notes, and notwithstanding their "payable on demand" feature, each of the Doctors understood and agreed among themselves and with the Debtor that the Notes would not be payable until the Debtor considered

> itself financially able enough to pay them and only after consultation, discussion and agreement among all of the Doctors.
>
> 15. Dr. Fischer acknowledges and agrees that the Notes should be considered equity contributions, but the other two Doctors, Defendants Kort and Cook, do not.

and ¶ 26 of the First Count states:

> 26. The Challenged Notes should be determined by the Court to be equity contributions.

### A. Court's Power to Recharacterize

Although the Second Circuit Court of Appeals has yet to address this issue, the Circuit Courts of Appeal that have considered it have all concluded "that the bankruptcy court has the power to recharacterize a debt as an equity contribution." In re Dornier Aviation (North America), Inc., 453 F.3d 225, 233 (4th Cir. 2006) (citing cases). Kort does not argue to the contrary.[1]

### B. Criteria for Recharacterization

"Recharacterization is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio.* In re AutoStyle Plastics, Inc., 269 F.3d 726, 747-748 (6th Cir. 2001) (citations and internal quotation marks omitted). Thus, the determination of whether an asserted debt should be recharacterized depends on the facts and circumstances as they existed at the time of the issuance of the notes. See, e.g. In re Cold Harbor Associates, L.P., 204 B.R. 904, 916-17 (Bankr. E.D.Va. 1997) (characterization depends on intent at time of transaction). Both parties, in their memoranda, refer to AutoStyle, 269 F.3d at 749-750, which sets out the following

---

[1] Cook terminated his employment in 2004. He has not appeared in this proceeding and the debtor's motion for default judgment against him under the First Count remains pending.

eleven factors that may be of significance in recharacterization of debt obligations:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

The court believes the following comment from Dornier Aviation, 453 F.3d at 234, discussing these factors is compelling and instructive.

> None of these factors is dispositive and their significance may vary depending upon circumstances....[N]o mechanistic scorecard suffices. And none should, for Kabuki outcomes elude difficult fact patterns. We think it important to note that a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim. In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans.

### C. Issuance of the Notes

The parties generally agree as to the circumstances behind the issuance of the notes. In 1991, Charles Lemkin ("Lemkin") was the debtor's accountant. In his deposition, taken in the state-court action, Lemkin testified as follows:

> The company is a professional corporation. For tax reasons it has a need to distribute all of its income annually. The tax that would be paid on any income that's left is extremely high.
> There was a pattern, a regular pattern of the company not having enough cash to fully pay out its profit each year, to bring its profit down to zero. It's a cash-basis taxpayer.
> Generally it recognizes income as it collects and it recognizes expenses as it pays as a general rule.
> And the pattern that it was in was one where it was difficult every year to come up with the cash to write the checks necessary to bring down the company's profit.

7

> I had suggested to them that there was a need for more permanent capitalization than what they were currently using, that they could – or they could deal with a line of credit but there was a need to arrange for more cash to be available.
>
> Of the various options, the one that they choose – they chose was to enter into the notes.

(Lemkin 9/20/2006 Dep. at 18-19.)[2]

> Fischer, in his deposition taken in the state-court action, testified:
> Q. Between the time of issuance of the note and let's say the year 2000, did the corporation have any difficulty paying its bills or other financial obligations?
> A. Not to my knowledge.
> ...
> Q. Was it your understanding that if a physician left the practice, that the notes would not be repaid?
> A. I had no discussion concerning these.

(Fischer 9/1/2006 Dep. at 23-25.)

"The use of demand notes along with a fixed rate of interest and interest payments is more indicative of debt than equity." AutoStyle, 269 F.3d at 750. The proceeds of the notes were not used to acquire any capital assets, but provided funds that allowed the debtor to manage its cash flow in a way that benefitted its income tax responsibilities. The debtor made regular payments of interest on the notes and deducted the interest paid on the notes from its otherwise taxable income. "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." Id. at 752; See also Roth Steel

---

[2] The Lemkin "Expert Report," which the debtor has submitted, is not to the contrary:
> III. Opinion
> Stockholders' loans to [the debtor] were made to mitigate an existing need for additional capital that was reasonably expected to continue indefinitely. At the time the loans were made, existing capital investment in [the debtor] was inadequate to meet its needs.

Tube Co. v. C.I.R., 800 F.2d 625, 632 (6th Cir. 1986); Stinnett's Pontiac Service, Inc. v. Commissioner of Internal Revenue Service, 730 F.2d 634, 640 (11th Cir. 1984); Estate of Mixon v. U.S., 464 F.2d 394, 410 (5th Cir. 1972) (same; in tax cases applying same factors).

The debtor asserts that it was having cash problems at the time the notes were executed. Accepting the debtor's statement as true, the court nevertheless concludes that such assertion is not material to the question of recharacterization under the particular circumstances involved. The uncontested evidence is that the debtor's cash situation in 1991 did not differ from what it had been in its prior years of operation and that its cash problems were attributable to the timing, for income tax purposes, of the bonuses paid to its shareholder-employees. By their practice of distributing all of the debtor's otherwise taxable earnings in the form of a bonus to each shareholder every year to minimize the debtor's tax burden, the shareholders made a decision not to retain earnings to augment the debtor's equity position.

The debtor also disputes that Kort had an expectation that he would be repaid; the debtor relies on Fischer's statement that, "Since execution and delivery of the [notes], Dr. Kort stated to me on numerous occasions that he never expected to receive a return of the $50,000 he provided to [the debtor]." (Fischer Aff ¶13.) Because the expectation of repayment is relevant to the nature of the transaction only at the time of the transaction, Fischer's statements concerning Kort's later expectations are not relevant.

The court, on the basis of the undisputed facts presented, accords the greatest significance to the following circumstances: (1) the unambiguous terms of the notes

9

themselves; (2) that the debtor regularly made, and deducted as an interest expense, interest payments on the notes; (3) that the use of shareholder loans rather than further capital investment is unexceptional; (4) that Kort is no longer an employee of the debtor; (5) that the debtor was able to pay its expenses when due, including compensation of $332,852.66 to Fischer for the year prior to filing; and (6) that the debtor remained solvent as of the petition date. The court concludes that the matters disputed by the debtor are not material to the question of recharacterization of the notes as a capital contribution and that "there can be but one reasonable conclusion." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. Kort is entitled to judgment as a matter of law on the First Count of the complaint.

V.

## SECOND COUNT - EQUITABLE SUBORDINATION

The debtor asks the court, in the Second Count, to equitably subordinate Kort's claim to the debtor's other unsecured creditors, asserting, as the grounds therefor, that "Kort has engaged in inequitable conduct by [1] terminating his relationship from the Debtor and then [2] demanding payment on the Notes without consultation, discussion and agreement with the other Doctors." (Complaint ¶ 31.)

Bankruptcy Code §510(c)(1) provides, in relevant part, that "the court may ... under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim."

> Equitable subordination is an unusual remedy which should be applied only in limited circumstances. Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.), 926 F.2d 1458, 1464 (5th Cir. 1991). In determining whether equitable subordination of a claim is justified, courts have generally applied the three-pronged Mobile Steel test, which requires (1) inequitable conduct by the creditor whose claim

10

> is to be subordinated (2) resulting in unfair advantage to the malefactor and/or harm to the debtor or its other creditors, and (3) that equitable subordination would not be inconsistent with other aspects of the Bankruptcy Code. Benjamin v. Diamond ( In re Mobile Steel ), 563 F2d 692, 699-700 (5th Cir. 1977); See also United States v. Noland, 517 U.S. 535, 538-39, 116 S.Ct. 1524, 1526, 134 L.Ed.2d 748, 754 (1996) (citing the Mobile Steel test as that generally followed)....

In re Mr. R's Prepared Foods, Inc., 251 B.R. 24, 28-29 (Bankr. D.Conn. 2000) (quoting White Current Corp. v. Rural Util. Svc. (In re Vermont Elec. Gen. & Transmission Coop., Inc.), 240 B.R. 476, 482 (Bankr. D.Vt. 1999)).

The court concludes that there was nothing inequitable about Kort's seeking repayment, following his resignation, in accordance with the unambiguous terms of the notes.

Cook's deposition establishes that, in August, 2003, Kort notified Cook, then president of the debtor, that he intended to pursue an employment opportunity in Hawaii. Cook thereafter submitted favorable written recommendations to Kort's prospective employers. Kort, on or about June 27, 2004, gave the debtor, as well as Cook and Fischer, three months notice of his intent to terminate employment. The debtor contends that Kort should have informed Fischer, as well as Cook, as soon as he decided to look for other employment. The court finds this argument unpersuasive. The debtor provided no evidence to support the imposition of such an obligation, and concedes that Kort's three-month notice satisfied the 60-day notice requirement of the employment contract. (R.56(a)2 Stmt. ¶¶29, 38.) It argues that Kort's lack of notice to Fischer was "unfair" since, as a result of Cook's retirement and Kort's termination, Fischer was left with the responsibilities of operating the debtor. The court concludes that the conduct complained of does not constitute the "inequitable conduct" necessary

to support a claim for equitable subordination of Kort's claim against the debtor in favor of other unsecured creditors.

## VI.

## THIRD COUNT - BREACH OF FIDUCIARY DUTY

The debtor does not dispute that he was an officer and director of the debtor, nor that, as such, he owed a fiduciary duty to the debtor and its shareholders. The debtor contends that "Kort breached his fiduciary to the Debtor, its other shareholders and/or the Debtor's creditors by [1] secretly seeking and obtaining employment elsewhere as a physician, [2] terminating his employment with the Debtor and then [3] demanding payment on the Kort Notes." (Complaint ¶36.) The debtor argues that, notwithstanding the terms of the note and the employment agreement:

> As a fiduciary, Dr. Kort had an obligation to subordinate his personal interests to the interests of his beneficiary, [the debtor]. Although the Kort Employment Agreement provided a contractual ability for Dr. Kort to resign as an employee of [the debtor], under the circumstances of this case, his fiduciary obligation to [the debtor] precluded his doing so if, as a result, [the debtor] had to respond to liabilities under the Kort Notes and the Kort Employment Agreement.

(Debtor's Mem. at 20.)

Under the reasoning urged by the debtor, an employee who is also an officer or director could be considered in breach of his fiduciary duties merely by resigning. The court rejects the debtor's analysis. The employment contract provided specific financial incentives upon termination of employment, based upon the amount of

12

advance notice given. (See Employment Contract ¶13.[3]) Such provisions, agreed to by both Kort and the debtor, would have been meaningless under the debtor's scenario where compliance could be deemed a breach of fiduciary duty. Accordingly, the court concludes that Kort complied with the terms of the employment contract and the notes, and that his doing so was not a breach his fiduciary duties to the debtor.

## VII.

## CONCLUSION

The court concludes that there are no genuine issues of material fact and that Kort is entitled to judgment on all three counts as a matter of law. The debtor's further argument that the court should exercise its discretion and deny the motion because the parties can immediately proceed to trial, (Debtor's Mem. at 7), is overruled. Kort's motion for summary judgment is granted and judgment shall enter dismissing the debtor's claims against him.

---

[3] The debtor's employment contract with Kort provides, in ¶12(c), for its termination "[u]pon 60 days prior written notice by either the Company or the Doctor to the other." It further provides, in ¶13, for "Additional Compensation" as follows:
> In the event of termination by action of the Doctor with less than nine (9) full calendar months' prior written notice, the Company shall pay to the Doctor, as additional compensation, a fraction or none of the amount payable under the preceding paragraph [an allocable share of accounts receivable], depending on the number of months prior written notice actually given, determined under the following table:

| Number of Full Calendar Months Prior Notice | Fraction of the Amount Payable |
|---|---|
| 6 but less than 9 | 2/3 |
| 3 but less than 6 | 1/3 |
| Less than 3 | Nothing |

13

Dated at Hartford, Connecticut this 29th day of October, 2007.

_____
ROBERT L. KRECHEVSKY
UNITED STATES BANKRUPTCY JUDGE